UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - v -

ANGELO MAZZEO,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

07 CRIM 1089

### COUNT ONE

**(Conspiracy to Commit Wire Fraud, Bank Fraud, and Money Laundering)**

The United States Attorney charges:

Background On Relevant Entities and Individuals

1. At all times relevant to this Information, Tullett and Tokyo Forex, Inc. ("Tullett and Tokyo") was a brokerage firm that offered brokerage services in the interbank spot foreign currency market and operated from offices located at 80 Pine Street, New York, New York.

2. From at least in or about 1996 to in or about March 1999, M.W. Marshall Inc. ("Marshall") was a brokerage firm that offered brokerage services in the interbank spot foreign currency market and operated from offices located at 75 Park Place, New York, New York. In or about March 1999, Marshall was bought out by Prebon Yamane ("Prebon"). Prebon was also a brokerage firm that offered brokerage services in the interbank spot foreign currency market and operated from offices located at 101 Hudson Street, Jersey City, New Jersey.

3. At all times relevant to this Information, Refco Capital Markets, Inc. ("Refco") was a financial institution with offices located in New York, New York and Bermuda. Among other things, Refco maintained a foreign currency trading desk.

4. From in or about 1995 until in or about 1999, ANGELO MAZZEO, the defendant, was employed as a foreign exchange broker for Tullett and Tokyo in New York, New York. From in or about 1999 through in or about the Fall of 2000, MAZZEO was employed as a foreign exchange broker at Marshall, and later at Prebon in New York, New York.

5. From in or about 1996 through in or about September 1998, a co-conspirator not named as a defendant herein ("CC-1"), worked as an interbank broker at Tullett and Tokyo. From in or about September 1998 through at least in or about November 2000, CC-1 worked as an interbank broker at Marshall, and later at Prebon. In or about January 1998, CC-1 opened a trading account in the name of Socree Limited at Refco for the purpose of receiving rigged foreign currency trades (the "Socree Trading Account"). Also in or about January 1998, CC-1 opened, and was the sole signatory for, a bank account in the name of So-Cree Ltd. at Euro Bank Corp. located in the Cayman Islands (the "So-Cree Bank Account"). In or about 1999, CC-1 opened, and was the sole signatory for, a bank account in the name of Monrovia,

Ltd. at Barclay's Bank located in the Cayman Islands (the "Monrovia Account").

### Background of Foreign Currency Exchange Markets

6.  The foreign currency exchange market is commonly referred to as the "forex" market. The forex market is enormous, with in excess of $1 trillion in transactions taking place per day.

7.  As a result of the enormous amount of currency trading that occurs throughout the world, banks move and manage huge portfolios of foreign currencies. This movement of deposits, and the transactions that banks and other large financial institutions enter into to manage their foreign currency exposures, is typically referred to as the interbank or interdealer market.

8.  Although there are no formal requirements for institutions to be able to participate in this market, in light of the size of a typical foreign currency transaction, an institution would have to be of sufficient size and creditworthiness to enable it to be accepted by other participants in the market.

9.  Forex trading in the interbank market is not executed on any physical exchange. Rather, in the forex market, buyers and sellers typically communicate and execute trades

directly with each other via computer links or telephonically, or they use an interbank broker, such as Tullett and Tokyo.

10. The interbank market is not a regulated market. Rather, due to the sophistication and financial status of the participants in the interbank market, Congress has permitted this aspect of the industry to self-regulate. There are no regulations requiring participants in the interbank market to contemporaneously time-stamp executed forex trades.

11. When an entity opens a position in a foreign currency by either purchasing or selling the currency against another foreign currency, the party taking the opposite position in the transaction is called a "counterparty."

### The "Points for Cash" Scheme

12. The "points for cash" scheme, also referred to as "the game," involved the following participants in the foreign exchange market: (i) corrupt bank traders willing to purposely execute forex trades to the detriment of their financial institutions; (ii) interbank brokers who would coordinate the forex trading for the benefit of co-conspirators; (iii) counterparties with whom the profitable side of the trades in the scheme are placed; and (iv) an individual with the ability to provide kickbacks to the various participants as a result of the trading scheme.

4

13. In the "points for cash" scheme, corrupt interbank brokers placed forex trades with pre-selected counterparties, to the detriment of banks and/or interbank brokerage firms, through several means, and for the benefit of the co-conspirators, including the defendant. Among the ways in which the "points," or trades, were diverted was the following: a corrupt bank trader purposely placed an off-market order[1] through a co-conspirator interbank broker, who in turn passed the benefit of the off-market order to pre-selected counterparties in exchange for a kickback. Thus, the bank traders knew at the time of the transactions that they were causing the banks they represented to lose money and simultaneously helping their co-conspirators to profit.

### Mazzeo's Participation In The Points For Cash Scheme

14. From at least in or about January 1998 up to and including at least in or about October 2000, ANGELO MAZZEO and CC-1, together with co-conspirators known and unknown, engaged and attempted to engage in a scheme to defraud banks and interbank brokerage firms of money and the honest services of their employees by means of a "points for cash" scheme. The defendant and his co-conspirators concealed from the banks and the interbank brokerage firms the involvement of the forex

---

[1] An "off-market" order is an order to buy or sell a currency at a price below or above the current market price for that currency.

5

traders and the interbank brokers in the scheme, their purposeful entry into losing trades and/or diversion of profitable trades, and their receipt of cash kickbacks resulting from the scheme.

15. From in or about January 1998 through in or about October 2000, ANGELO MAZZEO and CC-1 agreed with bank traders at large banks that, in exchange for the bank trader providing rigged trades to MAZZEO and CC-1 as brokers, CC-1 would provide the bank trader with a percentage of the profits in the form of a cash kickback. MAZZEO and CC-1 typically provided the corrupt bank traders with approximately fifty percent of the profits in cash.

16. In order to obtain the benefit of the rigged trades provided by the corrupt bank traders, ANGELO MAZZEO and CC-1 pre-selected Refco as the counterparty to the rigged trades. MAZZEO and/or CC-1 directed that the rigged trades for which Refco served as the counterparty be credited to the Socree Trading Account set up by CC-1 at Refco for that purpose.

17. In addition to obtaining rigged trades directly from corrupt bank traders, ANGELO MAZZEO and CC-1 agreed with other corrupt interbank brokers that, in exchange for the other interbank brokers obtaining rigged trades from their contacts at large banks, MAZZEO and CC-1 would permit the other brokers to use the Socree Trading Account at Refco for the purpose of acting as the counterparty to the rigged trades. MAZZEO and CC-1

further agreed to launder the proceeds of the fraudulent trading activity through CC-1's bank accounts in the Cayman Islands, and subsequently wire transfer percentages of the proceeds to the co-conspirators, or provide such kickbacks in cash. MAZZEO and CC-1 typically agreed to provide the corrupt interbank brokers approximately 50 percent of the proceeds as a kickback, from which the brokers were to pay a kickback to the corrupt bank traders.

18. After the rigged trades were credited to the Socree Trading Account at Refco, ANGELO MAZZEO and/or CC-1 directed that the funds in the Socree Trading Account be transferred to the So-Cree Bank Account at Euro Bank Corp. and/or the Monrovia Account at Barclays Bank, both located in the Cayman Islands. In turn, MAZZEO and/or CC-1 either wire transferred the funds directly to bank accounts in the United States and elsewhere controlled by the co-conspirator bank traders or interbank brokers, or wire transferred the funds to personal bank accounts in the United States in CC-1's name or under CC-1's control, and, in turn, CC-1 transferred funds from such accounts to the co-conspirators either through wire transfers, checks, or cash deliveries.

19. As a result of the rigged trading activity described above, fraudulent proceeds in the following amounts were transferred from the Socree Trading Account at Refco to the

So-Cree Bank Account and the Monrovia Account in the Cayman Islands: (i) from in or about January 1998 through in or about December 1998, in excess of approximately $2 million to the So-Cree Bank Account at Euro Bank Corp.; (ii) from in or about January 1999 through in or about December 1999, approximately $2.4 million combined to the So-Cree Bank Account and the Monrovia Account; and (iii) from in or about January 2000 through in or about April 2000, approximately $640,000 to the Monrovia Account.

## The Conspiracy

20. From in or about January 1998 through in or about October 2000, in the Southern District of New York and elsewhere, ANGELO MAZZEO, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to commit: (a) wire fraud, in violation of Sections 1343 and 1346 of Title 18, United States Code; (b) bank fraud, in violation of Section 1344 of Title 18, United States Code; and (c) money laundering, in violation of Section 1956(a)(2)(A) of Title 18, United States Code.

**OBJECTS OF THE CONSPIRACY**

**Wire Fraud**

21.     It was a part and object of the conspiracy that ANGELO MAZZEO, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, namely, a scheme and artifice, among other things, (i) to defraud banks and obtain their money and property, (ii) to defraud interbank brokerage firms and obtain their money and property, and (iii) to deprive banks and interbank brokerage firms of the intangible right to their employees' honest services, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Sections 1343 and 1346.

**Bank Fraud**

22.     It was further a part and object of the conspiracy that ANGELO MAZZEO, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits,

assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

### Money Laundering

23. It was further a part and object of the conspiracy that ANGELO MAZZEO, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to a place outside the United States and to a place in the United States from a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C. § 1343 and bank fraud in violation of 18 U.S.C. § 1344, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

### MEANS AND METHODS OF THE CONSPIRACY

24. Among the means and methods by which ANGELO MAZZEO, together with others known and unknown, would and did carry out the conspiracy were the following:

    a. MAZZEO and other interbank brokers obtained rigged forex trades from corrupt bank traders at large banks in

exchange for providing the corrupt bank traders with cash kickbacks.

  b. MAZZEO and the other interbank brokers provided the rigged trades to a pre-selected counterparty, Refco.

  c. CC-1 opened a trading account in the name of So-Cree Ltd. at Refco, and MAZZEO and CC-1 directed that the rigged trades be credited to the Socree Trading Account.

  d. Refco accepted the rigged trades for the benefit of the Socree Trading Account and with resulting losses for the banks.

  e. MAZZEO and CC-1 transferred the proceeds of the rigged trades to bank accounts set up in the Cayman Islands.

  f. MAZZEO and CC-1 wire transferred the fraudulent proceeds or paid cash kickbacks directly to the bank traders, or to other brokers, who, in turn, paid percentages of those kickbacks to the corrupt bank traders.

  g. The co-conspirators kept their participation in the scheme, including their receipt of cash kickbacks, hidden from the banks and from the interbank brokerage firms.

  h. The co-conspirators used interstate and foreign wires, including the use of interstate and international telephone calls, in furtherance of the objects of the conspiracy.

**OVERT ACTS**

25. In furtherance of said conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about April 16, 1998, a wire transfer in the amount of approximately $8,375 was sent from the So-Cree Bank Account at Euro Bank Corp. in the Cayman Islands to a bank account at Chase Manhattan Bank in New York, New York for the benefit of a corrupt bank trader.

    b. On or about March 25, 1999, a wire transfer in the amount of approximately $9,475 was sent from the So-Cree Bank Account at Euro Bank Corp. in the Cayman Islands to a bank account at the Bank of New York in New York, New York for the benefit of a corrupt interbank broker.

    c. On or about March 25, 1999, a wire transfer in the amount of approximately $9,775 was sent from the So-Cree Bank Account at Euro Bank Corp. in the Cayman Islands to a bank account at Fleet Bank in New York, New York for the benefit of a corrupt interbank broker.

    d. On or about March 25, 1999, a wire transfer in the amount of approximately $9,475 was sent from the So-Cree Bank Account at Euro Bank Corp. in the Cayman Islands to a bank account in the name of CC-1 at Citibank in New York, New York.

    e. On several occasions in 1999, ANGELO MAZZEO met with a co-conspirator not named herein, in Manhattan, New York, and provided cash to the co-conspirator as payment for the co-conspirator's making certain currency trades.

    f. On or about March 16, 2000, CC-1 wire transferred approximately $60,000 from an account at Chase Manhattan Bank to a bank account at the Bank of New York in New York, New York for the benefit of a corrupt interbank broker.

    (Title 18, United States Code, Section 371.)

_/s/ Michael J. Garcia_<br>
MICHAEL J. GARCIA /MM/<br>
United States Attorney

13

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**ANGELO MAZZEO,**

Defendant.

## INFORMATION

07 Cr. ___

18 USC § 371

MICHAEL J. GARCIA
United States Attorney.